## E. O. BROWN *v.* SAN FRANCISCO *et al.*

THE Governor and Departmental Assembly of California had power to make grants of lands within the general limits of pueblos, and the official acts of such officers, within the general scope of their powers, are presumed to have been done by lawful authority.

The Regulations of Secularization, by Governor Figueroa, August 9th, 1834, limiting the extent of land to be granted to any one individual to four hundred varas square, did not apply to pueblo lands, and did not limit the general power of the Governor and Departmental Assembly to grants of four hundred varas square.

Where land, within the general limits of the pueblo of San Francisco, and also within the limits of the old "Mission," was granted to an individual by the Governor and Departmental Assembly, in 1839–40, before the "Mission" had been entirely secularized, it would seem to have been, at the date of the grant,

exempt from the exercise of pueblo rights over it, and must be presumed to be grantable, just as any other land previously occupied by the mission establishments, but not exclusively dedicated to pious uses.

The fact that such grant recites the law of 1824, and the regulations of 1828, and no others, does not raise the inference that the grant was made only under the authority of that law and those regulations.

A grant may be made under other and different authority than that recited in the grant, and may be valid, although prohibited by the authority recited.

*Hart* v. *Burnett* (15 Cal. 530) commented on.

*Cambuston's Case* (20 How. 63) commented on, and explained.

*Query:* Whether, after final confirmation of land granted by the Governor and Departmental Assembly, and after patent by the United States, inquiry can be made as to the effect of any deviation, on the part of the Governor and Assembly, from the mode and manner prescribed by law for making grants—assuming that such grants were to be made solely by virtue of the law of 1824 and regulations of 1828.

APPEAL from the Twelfth District.

Action against the city and county of San Francisco and the Commissioners of the Funded Debt, under the Act of May, 1851, to quiet title. Plaintiff claims under a grant to one Bernal, as stated in the opinion. The city and county set up title as the successors to the old pueblo, and the Fund Commissioners claim under the act creating them. The case was shaped to present the question as to the power of the Governor and Departmental Assembly of California to grant lands within the limits of pueblos.

Plaintiff had judgment below; defendants appeal.

*S. W. Holladay, City and County Attorney,* for Appellants.

I. The law of 1824 and the regulations of 1828 empowered the Governor to grant to single individuals eleven square leagues of land, but these laws did not apply to pueblos or corporations. The land or property of the *nation* only is subject to colonization, or grant. A grant made without authority is void. (9 Cranch. 99; 5 Wheat. 303.) The Governors, with the assent of the Territorial Deputation, had power to grant four hundred varas square, within pueblo limits, but no more. (Art. 5 of the Decree of Figueroa, August 9th, 1834.) The Governor was an executive officer merely, and his acts are entitled to credit only so far as they were in conformity with the laws. This is held in *Hart* v. *Burnett,* (15 Cal.) where, in reference to grants by Governors within pueblo limits, it is said: " It will be presumed, unless

the contrary be shown, that such grants were made in accordance with the objects and uses for which such lands had been assigned and dedicated by the laws of the pueblo."

In the first volume of Rockwell's Spanish and Mexican Law, (435 and 436) it is said : " Where grants of land have been made by the Territorial Government, for towns, (*fundos legal para pueblos*) in conformity to the provisions of Arts. 10, 11, 12 and 13, of the Regulations of November 21st, 1828, the lands lying within the limits of such grants may be disposed of by the founders or municipal authorities, agreeably to the general laws regulating the government of such towns."

And again (436) : " These town grants are usually not only definitively limited in their extent, but are made with certain conditions, respecting the sale or division of these municipal lands, the price being fixed by law."

The first and second sections of the act of the Territorial Deputation of August 6th, 1834, delegated to the Ayuntamientos the power of subdividing the pueblo lands into "middling-sized and small portions," and leasing or giving them to the settlers. It will thus be seen that it was, neither by custom nor by law, within the sphere of the duty of the Governor to grant pueblo lands, and more especially where such grants were not " definitively limited in their extent." (See the Order of the Commandant General, Galindo Navarro, addressed to the Governor of California, dated June 21st, 1786 ; Plan of Pitic, art. 6.)

The case of *The United States* v. *Peralta,* (19 How. 347) cited by respondent, is incorrectly quoted. That case merely affirms the principle stated by this Court in *Hart* v. *Burnett. The Case. of Cambuston,* (20 How. 63) cited by respondent, refers to the colonization of the Territories, and not to the distribution or partition of pueblo lands ; but the exercise of the granting power by the Governor is there distinctly held to be subject and subordinate to the laws.

The grant in this case recites the law of 1824 and the regulations of 1828 as the authority for making it.

The ten grants made by Mexican Governors of more than four hundred varas square within pueblo limits were against law. Figueroa refused, in 1835, to grant the land in question to Bernal, the present grantee, because it was within the limits of the pueblo.

Nor could the municipal authorities make grants, except in lots. Larger grants were inconsistent with the trusts under which the lands

were held, for they must necessarily extinguish the trust, and withdraw the land from the control and supervision of the municipal authority and State sovereignty.

The restriction found in the twelfth section of the Colonization Law of 1824, forbids the granting of more than eleven leagues to one person. The case of *The United States* v. *Hartnell's Executors* (22 How. 286) is cited to show that the Supreme Court gives a strict construction to the law, and refuses to confirm more than eleven leagues to one individual, even where he had two several grants, of undoubted authenticity, for (in the aggregate) sixteen leagues of land. This Court will give the same construction to the law regulating the distribution of pueblo lands, making the *maximum* four hundred varas square, which the Governor might grant within the pueblo limits.

*Eugene Lies,* for Respondent.

[Mr. Lies filed an elaborate brief upon the system of pueblo lands, but nothing more can be given in this report than a mere outline. The question discussed was, in his own language, whether the Constitutional Governor of California could, with the assent of the Legislature, and after all due preliminary proceedings, according to law, make a valid grant for a tract of land, situated at so short a distance from a pueblo that, by operation of law, it would fall within the commons of that pueblo, or might fall within a tract to be adjudicated to it as commons.

[In maintaining the affirmative of the proposition, I find it indispensable to examine the Spanish system of commons from its reputed origin, allude to its introduction here, and notice the circumstances that prevented its full development. I shall demonstrate that, even in the modified form provided for California, the system was repugnant to the country and its people, and was never fairly inaugurated, and that to the hour of the American conquest, the oldest pueblos in California were, legally, new pueblos, imperfectly organized, whose inchoate claim to territory required legislation, and that at the hands of the very power whence emanates the grant whose validity is here at issue.

[After showing that the granting power of the Governor, had it not else existed, was the necessary consequence of the want of organization of the towns, I will attempt to show that it existed from the beginning, irrespective of such considerations, and was confirmed by sufficient enactments previous to the date of the grant under which the plaintiff holds.]

### *I.   History of the System.*

Under this head, the authorities cited were : Escriche, Baldio, Bienes' Comunes; L. 1, tit. 23, lib. 7, Nov. Rec.; L. 2, same title and book; Ley 3, Id. and notes; L. 17, tit. 25, lib. 7, Nov. Rec.; Title 5, L. 4 of the R. I.; *Hart* v. *Burnett*, 15 Cal. 530 ; Preface to the Leyes Vigentes; Ordinance of Neve ; L. 6, tit. 5, lib. 4; Proceedings of Territorial Deputation of twenty-third July, 1830.

### *II.   Facts in regard to the Limits of particular Pueblos.*

Under this head, a history is given of the attempts to mark out limits for the different towns in California, and the conclusion stated, that no pueblo here ever had its limits marked out according to law.   As to the pueblo of San Francisco, at the date of the grant in question, 1839–40, his result is, that no line had been or could have been assigned to the pueblo ; that, in the view of the authorities, San Francisco was a new pueblo, whose territorial rights might afterwards be determined as circumstances should dictate, and that between that pueblo and the lands here in question, there was a separate establishment, with distinct rights, whose determination was also left to the future ; that in making the grant now in question, they considered that they granted, not the commons of a pueblo, but an abandoned dependency of a mission.   That in doing so, they erred, and unwarily granted a tract within the four leagues belonging to the pueblo of San Francisco, was admitted, for the purposes of the discussion, and their right to grant the land, under those circumstances, maintained.

### *III.   Presumption of Power to grant, from its exercise, and instances of such exercise.*

Authorities cited: *United States* v. *Peralta*, 19 How. 347 ; 6 Peters, 729 ; 9 Id. 134 ; 18 How. 88 ; 13 Pet. 448 ; Cambuston's Case, 20 How. 63 ; *Hart* v. *Burnett*, 15 Cal.   For instances of the exercise of the power, counsel referred to the records in the United States Surveyor General's office, Espedientes Nos. 5, 51, 45, 337, 151, 78, 41, 42, 53, 78, 37.

### *IV.   Presumption of Sanction by the Supreme Government.*

Authorities: Counsel cited Reglamento of November 21st, 1828, arts. 9–15 ; Proclamation of Micheltorena, March 29th, 1843, sec. 2 ; Escriche and the Mexican Annotators comments under Bienes Concejiles ; Message of Alvarado to the Junta of March 27th, 1840.

### V.    *Power from Direct Enactment.*

Authorities : Elizondo Prac. For. V. 5, 226 ; Law of the Cortes of January 4th, 1813 ; Decree of Guttierez ; Arillaga, 1828, 154, R. L. 4, T. 7, L. 14 ; Guttierez's Opinion ; Sec. 2 of the Bill before the Territorial Junta, June 15th, 1834 ; Perez Compendio, vol. 1, 334 ; Mr. Hawes' brief case, No. 297.

As to the power of Prefects to make grants, counsel cited : Archives of the Surveyor General, Los Angeles, Miscellaneous 12, p. 46.

From the foregoing authorities, counsel derived these propositions :

I.   All the pueblos in Upper California were, to the hour of the American conquest, new pueblos, in the eye of the law entitled to commons to such an extent, and in such a location as the discretion of the sovereign power might assign under the circumstances of each particular case ; the habitual exercise of the right to, and the use of commons on the part of a pueblo being one of the leading circumstances.

II.   The four league rule was not inflexible, and might be departed from in either direction.

III.   The assignment of a limit for commons of pasture to a pueblo was not, by the law, inconsistent with individual ownership of particular tracts within those commons.

IV.   The consecration of a tract for commons, was an act emanating from the same authorities that held the power of granting to individuals.

V.   As regards new pueblos in California, the superior Departmental or Territorial authority held from the first, and preserved to the last, the right of granting to individuals tracts of land, however near to the center of population.

VI.   The limit upon their discretion, as to the size of the allotments, was removed by the Reglamento of Colonization, where the *minimum* agrees with the *maximum* of Felipe de Neve.

VII.   As regards even old pueblos, or fully organized municipalities, under the Spanish model, (if such institutions can be shown to have existed in California) the alienation of their lands of all kinds, viz : commons of pasture and tracts for cultivation, dedicated to municipal revenue, (necessary *ejidos* alone being excepted, in the real and restricted meaning of that word) was positively commanded by competent authority of law in the Decree of Cortes of 1813.

VIII.   So much of that decree was in force in California, in 1839, as did not refer to revenue for the Spanish crown, or was not otherwise repugnant to the Mexican Constitution.

IX. The Mexican law of the twentieth of March, 1837, without conferring new powers in this respect upon the Governor, except to make his determination final, was declaratory of his preëxisting power in the premises.

X. Both in Spain and in California, the commons of pueblos, old or new, were subject to be restricted or enlarged by enactment.

XI. A grant in 1839 by the Governor of California, approved by the Junta Departmental, of lands within even the assigned, or otherwise acknowledged limits of a pueblo, was a competent enactment, restricting *pro tanto* the extent of the commons of that pueblo, when that grant contained no clause providing that it should not so operate.

BALDWIN, J. delivered the opinion of the Court—FIELD, C. J. and COPE, J. concurring.

Plaintiff holds under a grant from the Governor of California, in 1839, approved by the Departmental Assembly, in 1840, and confirmed and patented by the United States, under the law of 1851. The grant was for one square league, a small portion of which, including the land in question, falls within the limits of four square leagues, measured, according to Mexican ordinances, from the center of the plaza of the old presidio. These facts are admitted. But defendants claim that the land in dispute, being within the general limits assigned by law to the pueblo, which was organized at the end of 1834, was not susceptible of grant by the Governor and Departmental Assembly of California. This question of law is now presented for our decision.

In *Hart* v. *Burnett et al.* (15 Cal. 544) we reviewed the facts connected with the existence of the "mission," and the organization of the "pueblo" of San Francisco, and suggested that, although a portion of these mission lands fell within the general limits of the pueblo, this pueblo may not have acquired a title to these lands, with right of possession, till after the secularization of that establishment, and then, probably, not to such portions of these lands as had been granted in private ownership, or dedicated to pious uses. Moreover, it was also shown that, although the general secularization law was passed in 1833, this mission had not been entirely secularized at the date of this grant, 1839 and 1840. There were numerous fluctuations and changes in the execution of this law of secularization, its execution being at one time entirely suspended, and the mission establishments partially restored to the direction and management of the mission priests. It

30

would be very difficult, if not impossible, to determine, at any particular time, what portions of these mission lands were considered as susceptible of grant by municipal or Territorial authorities, and what portions were considered as still in the possession of the mission establishments. We know of no other rule applicable to this case, than that of the well established rule of *legal presumptions,* that the land actually granted was susceptible of grant.

It would seem to follow, from these premises, that the portion of land in dispute in this case, being both within the general limits of the pueblo, and within the limits of the old mission, then only partially secularized, was still exempted from the exercise of pueblo rights over it, and, consequently, must be presumed to be grantable, the same as any other land previously occupied by the mission establishments, but not exclusively dedicated to pious uses, as in the case of " church lands."

But we do not place our decision entirely upon this view of the case. We shall decide the question submitted: Had the Governor and Departmental Assembly power to make grants of land within the limits of pueblos?

In discussing this question, we shall consider its application to the *tierras consejiles fundos legales,* or general body of land included within the pueblo limits, and not to the *propios* or *ejidos,* technically so called, which had been measured off, set apart, designated, or assigned, for particular uses, or for special purposes. It is not claimed that any such division, designation, or assignment was made of the lands of the pueblo of San Francisco, and the word *ejidos* is employed, in this case, in the loose and general sense in which it is often used in California documents, meaning municipal lands generally, and not the portion thereof which had been assigned for a special purpose.

We remarked, in *Hart* v. *Burnett et al.* (15 Cal. 549) " If Governors have granted lands within the general limits of pueblos, it will be presumed, unless the contrary be shown, that such grants were made in accordance with the objects and uses for which such lands had been assigned and dedicated by the laws to the pueblos. The whole matter was subject to the control and direction of the Governor and Territorial Deputation, and the official acts of such officers, within the general scope of their powers, are presumed to have been done by lawful authority."

The correctness of the general principles here announced is not disputed, but counsel for appellants have endeavored to destroy the force

of this presumption, by showing that this grant was not made by lawful authority, but in violation of positive law.

In the first place, it is said that this land being within the general limits of the pueblo, the law of 1824 and the regulations of 1828 had no application, and gave no authority to make the grant; and that it is to be inferred that this grant was made only under the authority of that law and of those regulations, because no others are recited or referred to in the grant.

On the contrary, it has been well settled, that a grant may be made under other and different authority than that recited in the grant, and that the grant may be valid, although the authority referred to in it may prohibit it being made. ( *United States* v. *Perchman,* 7 Peters, 95.)

Nor does it by any means follow, that, because a particular tract of land, or some portion of it, falls within the general limits of a pueblo, this pueblo has such a right or title to this land as to exempt it from the general operation of the granting powers of the Governor and Deputation.    The whole course of our reasoning in *Hart* v. *Burnett et al.* was opposed to this view of the character of pueblo titles.    It is unnecessary to repeat our arguments here.

Supposing this grant to have been made exclusively under the authority conferred by the law of 1824 and the regulations of 1828, it is contended that no presumption of power to grant this land can arise, because the Supreme Court of the United States decided against such presumption, in the case of Cambuston (20 Howard, 63).    We do not so understand that decision.    It does not pretend to overrule any of the former decisions of that Court with respect to legal presumptions.    It simply says, that where the authority to make the grant is expressly conferred, and the terms and conditions expressly prescribed by the law, the Court must look to the law for both the power to make the grant, and for the mode and manner of its exercise.    No deviation from the mode and manner prescribed in the law has been suggested, and even if there had been, it may be questioned whether, after final confirmation and patent by the United States, we can inquire into the effect of any such alleged deviation; and if the land belonged to the nation, there could be no question of the power to make the grant. The presumption is, that it did so belong to the nation, until the contrary is shown.    This has been attempted, by showing that it was within the legal limits of the pueblo; but, as already remarked, that is not

sufficient.  As shown in *Hart* v. *Burnett et al.,* the legal title to this land may, nevertheless, have remained in the nation, notwithstanding its general dedication or assignment to the pueblo.  The only question, then, to be considered is: Was this grant a violation of the general object and uses to which this land was assigned or dedicated ?  In other words: Did such assignment or dedication remove it from the exercise of the general authority to grant, conferred by the laws ?  This cannot be presumed; it must be shown.  But how is this shown ?  Certainly, not by the grant itself, for such a grant, on the very outskirts of the pueblo lands, and at a considerable distance from the principal settlement, is not *prima facie* evidence that it was contrary to the general object of building up a town by encouraging settlement and cultivation, but, on the contrary, that it was conducive to that object.  Moreover, the Governor, in this case, consulted the authorities, both of the pueblo and of the mission establishment, before making the grant, and neither made any objections.  It is true, that objections were made by the authorities of the mission, in 1834, before the organization of the pueblo; but these objections had all been removed when the grant was made and confirmed, in 1839 and 1840.  The Governor and Departmental Assembly seem to have acted with a full understanding of all the circumstances of the case, and we are not disposed, without good and substantial reasons, to question the authority and legality of their acts.

But it has been urged, that inasmuch as Governor Figueroa, in his Regulations of Secularization, of August 9th, 1834, specified that the extent of land to be given to one individual, or head of a family, should not exceed four hundred varas square, we must infer that this grant, for a greater amount, was without authority.  There is nothing in these regulations to show that any limitation had been placed upon the power of the Governor and Territorial Deputation, with respect to the extent of grants, other than that imposed by the general laws.  Moreover, the paragraph quoted refers to "the common lands of missions," not of pueblos.  That the Territorial Government did, even at that time, grant larger tracts than four hundred varas square of mission lands to individuals and heads of families, is shown by the records of that Government.  We find nothing in these regulations to sustain the proposition that the granting power of the Governor and Territorial or Departmental Legislature had been limited to four hundred varas to one individual, or that such limitation applied to the lands of a pueblo.

We have, thus far, considered this question on the supposition that

the power of the Governor and Deputation or Assembly to make grants was derived solely from the law of 1824 and regulations of 1828. But, as stated in *Hart* v. *Burnett et al.,* (15 Cal. 549) we are of opinion that their authority over pueblo lands existed prior to their date, and were not changed or repealed by them; and this opinion is not only sustained by the report of the Junta of Colonization, of 1827, but is confirmed by the documentary evidence referred to by counsel in this case.

In conclusion, we reaffirm the proposition announced in *Hart* v. *Burnett et al.*

The whole matter of granting lands, within pueblo limits, was subject to the control and direction of the Governor and Territorial Deputation; and the official acts of such officers, within the general scope of their powers, are presumed to have been done by lawful authority.

That the grant, in this case, was within the general scope of their powers cannot, we think, be denied; and the evidence and authorities adduced, show that their act, in making this grant, was done by lawful authority.

The decision of the Court below is, therefore, affirmed.