## RUDOLPH STEINBACH *v.* JOSEPH H. MOORE *et als.*

GRANT IN PUEBLO BY GOVERNOR OF CALIFORNIA.—A claim to land in a pueblo under a grant made by the Governor of California before its cession to the United States, was not a conveyance in fee of land in severalty, so as to excuse its presentation to the Board of Land Commissioners appointed under the Act of Congress of March 3d, 1851.

WHEN MEXICAN GRANTS CONVEYED PERFECT TITLE.—A title to land derived by grant from the Governor of California before its cession to the United States, was not a perfect title so as to excuse its presentation to the Board of Land Commissioners, while any further act was required on the part of the Mexican Government, or that of the United States as its successor, in order to invest the claimant with the entire legal title to and absolute possession of the specific lands granted.

GRANT OF "FOUR HUNDRED VARAS."—A grant of land of "four hundred varas" by the Mexican Government is understood to mean four hundred varas square, unless the description is controlled by other parts of the grant requiring a different form for the land granted.

MEXICAN GRANT IMPERFECT.—When a survey or juridical possession by competent authority was requisite in order to attach a Mexican grant of land to any specific tract of land, the grant was inchoate or imperfect.

CASES AFFIRMED.—*Leese* v. *Clark*, 18 Cal. 535, and 20 Cal. 387; and *Brown* v. *San Francisco*, 16 Cal. 451, affirmed.

APPEAL from the District Court, Fifteenth Judicial District City and County of San Francisco.

This was an action to recover possession of a tract of land in San Francisco, bounded on the north by Tracey street, on the east by Mission street, on the south by Centre street, and on the West by Guerrero street. The plaintiff averred in his complaint that on the 18th day of February, 1859, he was seized in fee of the demanded premises, and that the defendants ousted him on the same day, and prayed for judgment for possession. The defendants answered severally, denying the allegations of the complaint, and setting up title in themselves.

The plaintiff, on the trial, to sustain his allegation of ownership, offered in evidence the petition of Roberto T. Ridley to Juan B. Alvarado, Governor of Alta California, for a grant, the decree of reference, the *informe* of the Justice, and the concession by the Governor, which papers were admitted to be correct, and of which the following were admitted to be correct translations:

*Most Excellent Governor of the Californias:*

Roberto T. Ridley, a Mexican by naturalization, a resident in San Francisco, presents himself before your Excellency and says:

That intending to establish himself in the ex-Mission of Dolores, he solicits of your Excellency that there be conceded to him in said ex-Mission a ruined house by the name of Juan Prado (already deceased,) in order that he may repair it, with fifty varas to the east of said house, and four hundred varas between the house and the artilleryman Gomez and the Estero, in order to form his sowing ground, etc.

I hope then to receive this benefit from your Excellency in consideration of having been a long time in the country, and of having served in such capacity as the Departmental Government has placed me in.

From your Excellency, then, I, the undersigned, pray to receive this grace and favor. Not written on sealed paper, as I have none. Swearing that this is not done in malice, and that which is necessary, etc.

*San Francisco*, February 8th, 1841.

(Signed:)                          ROBERTO T. RIDLEY.

MONTEREY, February 12th, 1841.

Let the Juez de Paz of San Francisco report if the interested party possesses the necessary requisites to be attended to, and whether the land petitioned for pertains to any individual.

  (Signed :)        ALVARADO.

      JUZGADO DE PAZ OF SAN FRANCISCO, ⎞
         February 16th, 1841. ⎠

In view of the foregoing superior decree in relation to the demand for information, I will say that the petitioner possesses the necessary requisites, and that that which he solicits is ungranted and does not pertain to any particular person ; and if your Excellency should desire to do him that favor, you may do so according to your judgment.

  (Signed :)        F. GUERRERO.

       MONTEREY, March 20th, 1841.

In conformity with the request of the interested party, and in consideration of his merits and the services which he has rendered to the Departmental Government, there is conceded to him the house petitioned for in the new Pueblo of Dolores, making use at the same time of the four hundred varas of land for cultivation.

With this decree the interested party will present himself to the Judge of San Francisco, who will bear in mind this adjudication in the reports that may be asked of him in relation to the concessions in said pueblo.

Thus I, Juan B. Alvarado, Constitutional Governor of the Department of the Californias, command and sign.

         JUAN B. ALVARADO.

The defendant objected to their admissibility in evidence, on the ground that the said claim had not been presented to the Board of Land Commissioners, and because the alleged grant did not convey any estate, but was a mere permission for a temporary occupation.

The Court sustained the objection. The plaintiff was non-suited, and appealed from an order denying a new trial.

The other facts are stated in the opinion of the Court.

*B. S. Brooks*, for Appellant.

The grant in question conveyed not an *equity* but a legal right. Whether the right conveyed was a fee or a lesser estate, the right was a *legal* and not an equitable one. It was not *imperfect* nor *inchoate*. It did not look to or contemplate and further a future step to make it perfect or complete; and therefore it was beyond the reach of Congress and not within the jurisdiction of the Land Commissioners.

For seven hundred years, during the continued wars in Spain between the Spanish and Moors, *all* lands in the kingdom were divided into "*territoria.*" The walled town or castle was in the centre. All people were by law compelled to live in the town, and forbidden to live in the open country. The *territorium* was divided into *proprios, solares, ejidos, pastos, dehesas,* and *monte.* The *proprios* belonged to the town as its proper severalty. The *solares* belonged to their respective owners in severalty. The residue of the *territorium—ejidos, pastos,* and *dehesas*—belonged to the members of the community as community property. This system was a necessity of the state of the country. When the necessity ceased it became proper that the system should cease in Spain. Accordingly, it was determined that these lands should be reduced to private ownership, and for this purpose that they should be partitioned between the tenants in common, the members of the community. At different times this act was performed by different officers or commissioners, appointed by the government; not necessarily or usually by the officers of the town. The act was never called or spoken of or characterized as a *grant* or *concession*, but as a partition among the owners of common property, giving to each one his share in severalty. This act was called "*repartiamento.*"

These changes took place about the time of the discovery of America. As the colonists there were surrounded by Indians, the situation was very like that of Spain during the

civil wars, and it was natural that the system which they had been accustomed to for seven centuries should be carried with them to the new world. Accordingly, each settlement in the new world was decreed its *territorium* of four leagues. This, except the *proprios* and *solares,* was " community property." In California these settlements were Missions.

Spain decreed that this community property should be reduced to private property. Mexico, when she became independent, renewed the decree. The general government and territorial or departmental government adopted various measures and régulations for carrying out this object.

Figueroa decreed that the Missions should be secularized, August 17th, 1833. By article five of his provisional rules for the secularization of the Missions, it was provided, " To every individual head of a family, and to all those above twenty-one years of age, although they have no family, a lot of land for cultivation, (*suerte,*) whether irrigable or otherwise, of not exceeding five hundred varas square nor less than one hundred, shall be *given* out of the *common lands* of the Mission.

These lands had always been treated as community property. It was not a grant, but a *repartiamento*—partition. It partook rather of the nature of a judicial act. The duty of making this partition is not assigned to any particular functionary. The Governor might well perform it. By the new Constitution of Mexico this function is confided to the *Prefect,* who is not a town officer. It was not a grant made under the colonization laws. It was not subject to any conditions whatever. It was not an equity, but a legal right, and the assignment of a lot of four hundred varas out of the community property to one of the community, vested in him the fee. Such a title needed no act of Mexico or the United States to make it good. The change of government in no wise affected it. Congress had no power over it. The Act of Congress made no provisions for submitting such a claim to the Board of Land Commissioners, but expressly excluded it. (*Minturn* v. *Brower,* 24 Cal. 644; *Fairfax Dev.* v. *Hunter's Lessees,* 7 Cranch. 603; *Society, etc.* v. *New Haven,* 8 Wheat. 464;

*Soulard* v. *United States*, 4 Pet. 511, 512 ; *United States* v. *Arredondo*, 6 Pet. 712, 735, 742 ; *Henderson* v. *Poindexter*, 12 Wheat. 535 ; *United States* v. *Clarke*, 8 Peters, 449 ; *Delassus* v. *United States*, 9 Peters, 133 ; *City of New Orleans* v. *Amas & Cucullu*, 9 Peters, 236 ; *Mitchell et al.* v. *The United States*, 9 Peters, 734 ; *United States* v. *Fernandez*, 10 Peters, 305 ; *Smith* v. *United States*, 10 Peters, 395 ; *Mackay·* v. *United States*, 10 Peters, 342 ; *Strother* v. *Lucas*, 12 Peters, 435, 436 ; *United States* v. *Kingsley*, 12 Peters, 484 ; *Garcia* v. *Lee*, 12 Peters, 519 ; *McDonough* v. *Williamson*, 3 How. 706 ; *Vanderslice* v. *Hanks*, 3 Cal. 27 ; *Ferris* v. *Coover*, 10 Cal. 598 ; *Waterman* v. *Smith*, 13 Cal. 411 ; *Teschemacher et al., Executors* v. *Thompson*, 18 Cal. 11 ; *Moore* v. *Wilkinson*, 13 Cal. 486, 487 ; *Green* v. *Little*, 8 Cranch. 247 ; *United States* v. *Pillerin et al.* 13 How. 10 ; *Fremont* v. *United States*, 17 How. 557 ; *United States* v. *Peralta*, 19 How. 348 ; *Leese & Vallejo* v. *Clark*, 3 Cal. 17 ; *Gunn* v. *Bates*, 6 Cal. 271 ; *Morton* v. *Folger*, 15 Cal. 277 ; *Seaward* v. *Mabbott*, 15 Cal. 306 ; *Cornwall* v. *Culver*, 16 Cal. 423 ; *Riley* v. *Heish*, 18 Cal. 198 ; *Soto* v. *Rueder*, 19 Cal. 87.)

·*Patterson, Wallace & Stow*, for Respondents.

If the grant relied on by plaintiff was issued, the *granted* premises were no longer a part of the pueblo land of San Francisco. The confirmation or *rejection* of the pueblo claim, therefore, cannot affect the status of such grant, *because* it is not " a grant from any corporation or town," but was claimed adversely to the pueblo. (Section 14 of the Act of March 3d, 1851, " to ascertain and settle the private land claims, etc ;" see *E. O. Brown* v. *San Francisco*, 16 Cal. 451.)    Hence, the grant offered in evidence falls within section eight and section thirteen of that Act.    "And all lands the claims to which shall not have been presented," etc., "shall be deemed, held, and considered as part of the public domain of the United States." (4 Howard, 458 ; 16 Id. 96 ; 18 Id. 126 ; 18 Id. 134 ; 8 Id. 310 ; 21 Id. 426 ; *Strother* v. *Lucas*, 12 Peters, 448 ; 11 How. 202 ; 3 Id. 55 ; 19 Alabama, 386, 392, 393 ; 21 Howard, 477,

478.) There was no juridical possession—no possession taken —no location or demarcation of the boundaries. What shape is the "fifty vara to the east of said house?" Is it to be of the width of the house, and forming a parallelogram, or a square? Is the house to be in whole or in part one of the sides of the fifty varas? The lands solicited are "a ruined house, with fifty varas to the east of said house," and "four hundred varas between the house and the artilleryman Gomez, and the Estero." Under the description it might be located certainly in two shapes, and the Court will readily perceive, in many more, depending upon the initial point. The location of the four hundred varas is somewhere between the house and the artilleryman Gomez, and the Estero. What distance from the house, from Gomez, and the Estero, is certainly indefinite. Being indefinite, it is an "inchoate grant," and required the action of the political department, a survey, to make it complete. (*Estrada* v. *Murphy*, 19 Cal. 248.) A private survey would not aid plaintiff. (*Waterman* v. *Smith*.) No public survey can be made, the surveying department being only authorized to survey confirmed grants.

*Waller & Moore*, also for Respondents.

The alleged grant was at best an imperfect or inchoate claim; an *equity*, to be ripened into a legal title, *only* through confirmation by the Land Commission. (*Barry* v. *Gamble*, 3 Howard, 33; *Le Bois* v. *Bramell*, 4 Howard, 449; *McCabe* v. *Worthington*, 16 Howard, 96; *Strother* v. *Lucas*, 12 Peters, 438.) The alleged grant being imperfect or inchoate, the omission to file the claim with the Land Commission absolutely and forever barred the claim. The land was thereby forfeited to the claimant, and "is to be deemed and held as part of the public domain." (Act of Congress of March 3d, 1851, Secs. 3 and 13; *Strother* v. *Lucas*, and *McCabe* v. *Worthington*, above cited; *Estrada* v. *Murphy*, 19 Cal. 248; *Rico* v. *Spence*, 21 Cal. 504; *Minturn* v. *Brower et als.*, 24 Cal. 644.)

By the Court, RHODES, J.:

The plaintiff offered in evidence the petition of Ridley to Governor Alvarado, in which he solicited that there might be conceded to him in the ex-Mission of Dolores " a ruined house by the name of Juan Prado (already deceased,) in order that he may repair it, with fifty varas to the east of said house, and four hundred varas between the house and the artillery-man Gomez and the Estero, in order to form his sowing ground," etc.; and he also offered the concession of the Governor, by which there was conceded to the petitioner the " house petitioned for in the new pueblo of Dolores, making use at the same time of the four hundred varas of land for cultivation." The plaintiff admitted that the claim to the land mentioned in the petition had not been presented to the Board of United States Land Commissioners; and on that ground the defendants objected to the admission in evidence of the petition, concession and the accompanying papers, and they were excluded by the Court. This ruling constitutes the principal ground of controversy in the case.

The counsel for the plaintiff contends that the action of the Governor as shown by the petition and accompanying papers offered in evidence amounted to " a *repartiamento*—a proceeding in its nature judicial, a partition of common property— conveyed land in severalty in absolute fee to Ridley; was perfect in itself; required no further act to be done on the part of the Government; derived its existence from the right of the pueblo; did not require to be presented to the Board of Land Commissioners, and was not within their jurisdiction."

### *Mexican grant in pueblo.*

In support of these positions the counsel has filed an elaborate brief—showing very careful research, and remarkable industry, as well as an intimate acquaintance with the law relating to the topics treated of—in order to show the origin, nature, force and effect of a *repartiamento;* and for this pur-

64

pose he has traced the origin, history and nature of pueblos, and the nature and extent of their communal property, from a period anterior to the foundation of Rome, down through the laws and customs existing during the successive Governments of Spain and Mexico, to the colonization of California. The purpose of this is to show that the grant of the Governor was only a partition of the common lands of the pueblo, that the grantee held in severalty, by a perfect title, and under and by title derived from the pueblo, and that therefore the Court was in error in excluding the papers offered in evidence, on the ground that the claim to the land had not been presented to the Board of Land Commissioners according to the eighth section of the Act of Congress of March 3d, 1851. The very able argument of the counsel, supported by such copious citations from the Spanish laws upon the points discussed, would, we have no doubt, have been of service to the Court in considering the case of *Leese* v. *Clark*, 18 Cal. 535 and 20 Cal. 387, as well as *Brown* v. *San Francisco*, 16 Cal. 451, and *Hart* v. *Burnett*, 15 Cal. 530 ; but it comes too late. Mr. Chief Justice Field, in delivering the opinion of the Court in *Leese* v. *Clark*, 18 Cal. 570, says : " For these reasons we are of opinion that the Court erred in its construction of the second provision of the fourteenth section, and that the fact that the premises described in the grant of Alvarado and patent of the United States were town lots of a pueblo existing on the 7th of July, 1846, or at the date of the grant, on the 21st of May, 1839, did not exclude the claim of the grantees from the jurisdiction of the Board, or require the presentation of their claim by the corporate authorities. It is only where lots *are held. under concessions from such authorities*, or belong to the pueblo, that the claim must be presented as required by the fourteenth section. Leese and Vallejo did not hold or claim under any corporation or town, but directly by grant from the Governor, and their claim is not therefore embraced by the provisions of the section in question when that section is properly construed. It was a claim to be presented under the eighth section of the Act ; it was so presented, and jurisdiction, in our opinion, was

rightfully taken of it by the Board." And the Court said that a similar construction had been repeatedly given both by the Board and the United States District Court; and that a denial of such jurisdiction at that day "would lead to a disturbance of numerous titles and injuriously affect vast interests within the limits of the city." The doctrine of that case having long before that time become rule of property, and it then being so clearly affirmed, we do not now, after the lapse of five years, feel at liberty to re-examine the question. Consequences still more serious must ensue if a different construction of that section should be given; and we are fully justified on this, if on any question, in invoking the doctrine of *stare decisis.*

The only ground upon which he can base his claim to exemption from the operation of that clause of section thirteen which declares that "all lands, the claims to which shall not have been presented to the said Commissioners within two years after the date of this Act, shall be deemed, held and considered as part of the public domain of the United States," is to be found, if anywhere, in the fact, as alleged by him, that his title was a perfect title at the time of the cession of California, and according to the principles announced in *Minturn* v. *Brower*, 24 Cal. 644, was not subject to the provisions of the Act of Congress, and liable to be defeated upon the failure of the claimant to present his claim to the Board of Land Commissioners.

### Inchoate Mexican grant.

The defendants do not controvert the principles of that case, nor does the plaintiff deny the authority of the numerous cases, both in the Supreme Court of the United States and of this State, holding that claims to land depending upon imperfect titles, must be presented to the Board of Land Commissioners for confirmation, according to the provisions of the Act of Congress, under the penalty, in case of failure, of having the land "deemed, held and considered as part of the public domain of the United States."

It is unnecessary to discuss here the questions considered in *Minturn* v. *Brower*, or to define a perfect title derived from the Spanish or Mexican Government; and it will be sufficient for all the purposes of the present inquiry to say, that a title derived from that source was not perfect while any further act was required on the part of the Mexican Government or that of the United States, as its successor, in order to invest the claimant with the entire legal title to, and the absolute possession of, the specific lands granted.

The land granted is described in the grant only by reference to the petition, and it is therein described as " four hundred varas between the house (the ruined house in the ex-Mission of Dolores,) and the artilleryman Gomez, and the Estero." The words " four hundred varas " are understood to mean four hundred varas square, unless they are controlled by other portions of the description requiring a different form for the land granted, and such is the usual construction of similar words when found in Mexican grants. It does not appear from the documents offered by the plaintiff, by any reasonable construction, that the ruined house mentioned, the house of Gomez, and the Estero, constituted the boundaries of the four hundred varas intended to be granted, whether the same was taken in a square, or, indeed, in any other form. The two houses might become points in boundary lines, but were not of themselves boundary lines. A survey, or a juridical possession made or given by competent authority, was requisite in order to attach the grant to any specific tract of land—to segregate the particular parcel intended to be granted. (*Strother* v. *Lucas*, 12 Pet. 438; *Barry* v. *Gamble*, 3 How. 33; *McCabe* v. *Worthington*, 16 How. 96.) While such act remains to be done, the grant is regarded as inchoate or imperfect. The same difficulty also exists in respect to the fifty vara lot.

Judgment affirmed.